**UNITED STATES of America, and Arthur J. Sheridan, Revenue Agent, Internal Revenue Service, Petitioners,**

v.

**Robert B. ACKER, as Secretary of Standard Oil Company of New Jersey, Respondent.**

**No. M–18–304.**

United States District Court, S. D. New York.

March 17, 1971.

Whitney North Seymour, Jr., U. S. Atty., for the Southern District of New York, for petitioners; Michael I. Saltzman, Asst. U. S. Atty., of counsel.

Sullivan & Cromwell, New York City, for respondent; Roy H. Steyer, John L. Warden, Willard B. Taylor, A. E. Collier, New York City, of counsel.

## OPINION

FRANKEL, District Judge.

By a summons under 26 U.S.C. § 7602[1] agents of the Internal Revenue Service called upon respondent, as Secretary of Standard Oil Company of New Jersey, to produce minutes of meetings held in 1962 and 1963 by the boards of directors and executive committees of Jersey itself and 17 affiliated corporations which were included in Jersey's consolidated federal income tax returns for those two years. The respondent, bringing to formal and justiciable issue a dispute that matured some time ago, refused compliance. The government seeks an order of compulsion under 26 U.S.C. § 7604.[2] In opposition, respon-

[1]. "For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate is authorized—

(1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry;

(2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary or his delegate may deem proper, to appear before the Secretary or his delegate at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and

(3) To take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry."

[2]. "(a) Jurisdiction of district court.—If any person is summoned under the internal revenue laws to appear, to testify, or to produce books, papers, records, or other data, the United States district court for the district in which such person resides or is found shall have jurisdiction by appropriate process to compel such attendance, testimony, or production of books, papers, records, or other data.

"(b) Enforcement.—Whenever any person summoned under section 6420(e) (2), 6421(f) (2), 6424(d) (2), or 7602 neglects or refuses to obey such summons, or to produce books, papers, records, or other data, or to give testimony, as required, the Secretary or his delegate may apply to the judge of the district court or to a United States commissioner for the district within which the person so summoned resides or is found for an attachment against him as for a contempt. It shall be the duty of the judge or commissioner to hear the application, and, if satisfactory proof is

dent argues that (1) the minutes sought by the summons are outside the scope of the underlying statute—i. e., beyond the category of "books, papers, records, or other data which may be relevant or material" to the Service's inquiries and (2) the summons, by making a demand so broad, attempts an "unreasonable search" that offends against the Fourth Amendment. The undisputed facts recounted in the motion papers are as follows:

Standard of New Jersey, which the court could perhaps notice as an enterprise of some size, has interests and operations extending widely across this country and abroad. It files consolidated income tax returns as the common parent of an affiliated group of corporations which, in 1962 and 1963, included about 75 domestic corporations. Examination of such returns by the IRS is a continuous process; four agents from the New York District Director's office are assigned full time to this work, and they are assisted by specialists from the Service in foreign operations, in problems affecting property (valuation, depreciation, etc.) and in employee benefit plans. This work in New York City is supplemented by regular examinations of important Jersey affiliates elsewhere, such as Humble Oil & Refining Company (one of the 17 listed in the summons involved here) at its principal office in Houston, Texas.

Beginning in 1957 the agents conducting these examinations requested minutes for the boards and executive committees of Jersey itself and some of its affiliates. These requests were granted without objection over a period of 10 years or so. In late 1967, however, the company's associate general counsel, who soon rose to be general counsel, took note of this practice and concluded that

it was improper. As he describes the next steps in his affidavit here:

"* * * At my instance, after review and consideration by Jersey's management, the Service was advised that it would no longer be permitted unlimited access to all minutes but that Jersey would continue to cooperate in the examination of its consolidated returns, and in particular would make available for inspection all minutes which might have a bearing on the determination of Jersey's income tax liability.

"* * * The decision that the Service would no longer be permitted to examine all corporate minutes was taken because the scope of the Service's authority to examine books, papers, records and like documents is limited to documents which may be relevant or material to the determination of income tax liability. Many of the corporate minutes of Jersey and, I am informed, of its affiliates do not bear on tax liability, and in my experience at Jersey, no other agency or department of the United States has been given the kind of unlimited access to minutes (or other documents) as is requested here by the Service."

Elaborating upon the analogy from practice by other agencies, this affiant goes on to observe:

"* * * It is the practice of other government agencies to particularize the subject matter of a request to Jersey for documents, and the policy and practice of Jersey to produce for examination only such documents, including minutes, as are within a particularized, appropriate request made in the course of a lawful inquiry."

As an alternative to its former policy of simply delivering the requested minutes, the company proposed to the

made, to issue an attachment, directed to some proper officer, for the arrest of such person, and upon his being brought before him to proceed to a hearing of the case; and upon such hearing the judge or the United States commissioner shall

have power to make such order as he shall deem proper not inconsistent with the law for the punishment of contempts, to enforce obedience to the requirements of the summons and to punish such person for his default or disobedience."

Service in late 1967 an arrangement it sketched in a memorandum entitled "Minute Procedure." As the memorandum proposed it, the procedure contemplated the following:

"All minutes of the Company which are action minutes, e. g., resolutions, approvals, etc., will be digested and lists prepared by the Company. These listings will not include extracts of minutes which are not of the action type; such as, reviews of financial conditions and forecasts, forward planning projects, executive development reviews, or reports on economic conditions, or future energy requirements, and other minutes which do not reflect actual decisions or actions by the Board. The digests of action minutes prepared by our Secretary's Department will be separated into two lists separating those that are relevant to an examination of the Company's tax return and those that are not. Minutes on projects and proposed contracts on which action was taken but which was not consummated will not be listed as relevant. For example, minutes relating to the Tidewater and Potash acquisitions which were never consummated, and Esso International minutes authorizing the quoting of specific prices on sales of crude or products which were not consummated will not be listed. The listing showing relevant action minutes will be made available to the IRS with the understanding that if there is an interest in any specific item a copy of the complete minute will be given to the IRS."

There was some discussion leading to some modification of the proposal, and the parties worked with it on a trial basis for a couple of years. In the summer of 1969, however, the Service informed the company that the arrangement could not continue to be acceptable and that it would insist upon the former practice of seeing the minutes for Jersey and designated affiliates. The resulting impasse has led to the instant proceeding.

## I.

To focus on what is in issue under the statute, and to put aside what is not, the controversy centers upon the language in 26 U.S.C. § 7602 authorizing production of records "which may be relevant or material to [the] inquiry * * *." Many of the minutes demanded, the company says, are not "relevant or material * * *." The Service has not "particularized" its request to aim at what "may be relevant or material." And so, the argument concludes, the demand in the summons is excessive, unauthorized and unenforceable.

There is no suggestion that compliance would be burdensome or oppressive in any sense beyond the foregoing claim of statutory excess. There is no appeal on grounds of trouble, expense, disruption or other hurts commonly the subject of quarrels about subpoenas. There is no claim of privilege; despite occasional references in the papers to "confidentiality," the possibility of such a defense was explicitly disavowed at the argument of the motion.

In short, the company's contention, starkly but fairly etched, is that the Service has asked for more than the statute authorizes and must be denied on that ground. And there is no question, of course, that the result follows if the premise is sound.

This leads us, then, to look closely at the decisive words entitling the Service to demand things that "may be relevant or material," but not more than that. According to the company, the words mean that the Service must "particularize," must identify the subjects or transactions ("or particular items of income or deduction") about which it seeks papers, and may not demand categories of papers like the minutes here in question without some such specification of topics. To buttress the point, the company's general tax counsel describes in his affidavit a number of minutes among those demanded which he says "are neither relevant nor material to the determination of Jersey's income tax liabili-

ty"—mentioning, *inter alia,* minutes recording talk of proposed lines of business expansion, investment ideas, litigation, employee problems, company security, and other things.

In answer to this, the Service says it may not be confined to accepting the taxpayer's word on relevance or materiality. It is not enough, the argument goes, for tax counsel to look at the minutes and give his judgment about what should be looked at by the IRS. The statute requires disclosure of things that *"may* be relevant or material," and the minutes in question are clearly within that broad field of possibility.[3]

More specifically, government counsel cites works on accounting to show that "generally accepted auditing and accounting procedures * * * require a review of corporate minutes in the proper audit of a business's financial records." These familiar procedures, it is urged, justify the demand for such minutes as part of the "statutorily mandated inquiry into the correctness of [the corporate] returns." The analogizing of an IRS examination to an "audit" may be imperfect, as the company responds. But the response proves too much in the end; for it helps to demonstrate why IRS agents, not less than accountants, must inevitably look at things that are irrelevant and immaterial to avoid overlooking some that are relevant and material. The substance of the company's position on this aspect of its argument is the affidavit of a member of its accounting firm. This certified public accountant reports that he supervises the annual audits of Jersey's con-solidated financial statements; that this task "is a broad, complex engagement involving various techniques and purposes" (including "review for future financial commitments and contingent liabilities and review for compliance with prescribed internal accounting controls and procedures"); that as an "essential aspect of the contractual relationship" between the company and its accountants, the latter "have complete access, upon request, to all documents in Jersey's files;" that the accountants review, among other documents, "the minutes of the boards of directors and executive committees of all companies examined in the consolidated group" for two specified purposes, neither of which "relates *directly* [emphasis added] to the determination of the income of the company" but "might be required to be disclosed in the [annual] financial statements * * * [and] be important to an interpretation of [them];" that "generally accepted auditing standards require a complete review of all minutes of all companies examined in Jersey's consolidated group;" but that, even so, "many of the minutes [thus reviewed by the accountants] are not relevant to [their] engagement by Jersey and have no financial significance, and certainly are not relevant or material to Jersey's tax liability."

That careful account, aside from the gratuitous legal judgment of the accountant as to what may be "relevant or material to Jersey's tax liability," goes far to destroy rather than sustain the company's position in this proceeding. The accountants, to be sure they see

---

3. A supplemental memorandum for respondent characterizes the government's position as asserting "authority * * * to examine papers which are concededly irrelevant and immaterial in order to make its own determination of relevance." This is not and could not be the government's position. The Service cannot "concede" the irrelevance of things it has not seen any more than it can know for certain that such things are relevant. What it can do—or be required to do— is look only at areas or things that could

rationally be expected to yield relevant or material information. Corporate minutes are such things. Perhaps all business records are, subject to a *concrete* showing of the contrary by the corporate taxpayer. However that may be, it is no concession of excess by the government if the corporate official can look among the undisclosed papers and select some he is able confidently, and probably correctly, to tag as irrelevant and immaterial.

what is germane to their task, look at minutes that turn out not to be germane. They do not accept the views of others as to what they ought to examine, and the company does not expect them to do so.[4] This makes sense for them. It makes equally good sense, *mutatis mutandis*, for the agents of the IRS.[5]

██ When we turn to the governing precedents, we discover what is not altogether extraordinary—that the dictates of good sense are in line with the law's commands. The cases show that the statutory provision for the examination of papers that *"may* be relevant or material"—properly viewed as a prediction about things yet unseen, not as a judgment about materials presented or offered for "rulings"—has to mean what it quite simply says: that the demand may extend to documents that "might" throw light upon subjects under legitimate inquiry. E. g., Foster v. United States, 265 F.2d 183, 187 (2d Cir.), cert. denied, 360 U.S. 912, 79 S.Ct. 1297, 3 L. Ed.2d 1261 (1959). The agents of the IRS cannot and they need not guarantee that everything they wish to see *will* be relevant or material to their inquiries any more than Jersey's accountants can do for theirs. Like a grand jury, to which its powers are analogous, Foster v. United States, *supra*, 265 F.2d at

186–187, collecting authorities, the Service is not required to show "cause" or "probable cause" to justify the examination it seeks. It is sufficient that the demand for documents be made "pursuant to a legitimate purpose, [and] that the inquiry *may* be relevant to the purpose * * *." United States v. Powell, 379 U.S. 48, 57, 85 S.Ct. 248, 255 (1964) (emphasis added). The materials demanded must be "sufficiently relevant to the investigation," United States v. Harrington, 388 F.2d 520, 523 (2d Cir. 1968), a standard to be applied to categories of documents, not to every single document within any category. So, for example, to look no further than the case just cited, it may be confidently supposed that not all the books and records there required to be produced (by a third party, not the taxpayer himself) would prove "relevant or material" to the subject being explored. But it was enough even where the burden was upon the third party there involved that there was "in the particular circumstances an indication of a realistic expectation rather than an idle hope that something [might] be discovered." *Id.* at 524.[6]

It is common knowledge, reflected in the decisions, that production demanded by grand juries, by parties conducting

4. As the point is expressed in a supplemental memorandum for Jersey:
"The fact that [the accountants] examine corporate minutes does not establish that all such minutes are relevant or material to any purpose, but shows only that [the accountants] have made an examination of such minutes in order to make this determination for themselves. In the course of their review [the accountants] see many minutes which, in their opinion, are neither relevant nor material to Jersey's consolidated financial statements or to correctness of its income tax returns * * *."

5. The company points out that the relationship with its accountants "is purely consensual," and that "[t]here are no statutory or constitutional restrictions on the scope of the [accounting firm's] examination * * *." This does not make irrational or inapposite the comparison considered here in judging wheth-

er the Service has proceeded reasonably, sensibly and responsibly both in performing its duties and in observing its limitations—or, in shorter and more authoritative terms, whether the IRS agents have observed their obligation "to exercise prudent judgment in wielding the extensive powers granted to them by the Internal Revenue Code." United States v. Powell, 379 U.S. 48, 56, 85 S.Ct. 248, 254, 13 L.Ed.2d 112 (1964) (footnote omitted).

6. The Court of Appeals in *Harrington* stressed that "judicial protection against the sweeping or irrelevant order is particularly appropriate in matters where the demand for records is directed not to the taxpayer but to a third-party who may have had some dealing with the person under investigation." *Id.* at 523. Since the summons here is for papers of the taxpayer itself, that opinion operates *a fortiori* against respondent.

private discovery and by administrative subpoenas—all governed by broadly similar concepts of "relevance"—will inevitably include large numbers of particular documents that are found by the person or agency making the demand to be irrelevant or immaterial. E. g., Civil Aeronautics Board v. Hermann, 353 U.S. 322, 77 S.Ct. 804, 1 L.Ed.2d 852 (1957).[7] The familiar anguish about "fishing expeditions" has been met in this context with the observation that "the Secretary or his delegate has been specifically licensed to fish by § 7602." United States v. Giordano, 419 F.2d 564, 568 (8th Cir. 1969); see 1 Davis Administrative Law Treatise § 3.06 (1958). A power so wide is the kind of which it has been said that "[d]oubtless abuses * * * may be imagined * * *." Hale v. Henkel, 201 U.S. 43, 65, 26 S.Ct. 370, 50 L.Ed. 652 (1906). And the courts are open to block intrusions "of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power. * * * But it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." United States v. Morton Salt Co., 338 U.S. 632, 652, 70 S.Ct. 357, 369, 94 L.Ed. 401 (1950).

■ Principles that broad may lead to some close work in particular applications. But the present case seems clear. The ongoing inquiry into Jersey's large tax affairs, occupying huge amounts of agents' time, is unquestionably authorized. The demand in question is definite, limited and in no way burdensome. The materials sought are "reasonably relevant" in an obvious, decisive and essentially undisputed sense. This is to say, respondent nowhere disputes, but in effect concedes, that many pages of the minutes sought bear on the company's tax liabilities. The argument is, simply, that many other pages do not. But that, on the familiar principles recalled above, is no ground to resist the proposed examination or to insist that the Service further "particularize" its demand.

The court concludes that the Service is correct and respondent wrong in the controversy as to the meaning and effect of 26 U.S.C. § 7602.

## II.

■ The conclusion with respect to the statute, whichever way it might have gone, was destined from the outset to be dispositive. Respondent has seen fit to add as an asserted further point that the summons, if upheld under the statute, must be deemed "void under the Fourth Amendment * * *." In the circumstances of this case—where the summons is precise, narrowly drawn, and in no way oppressive, as conceded by respondent and reflected by ten years of uneventful compliance until 1967—the argument seems frivolous. Oklahoma Press Pub. Co. v. Walling, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946); United States v. Shlom, 420 F.2d 263, 266 (2d Cir. 1969); cf. Wyman v. James, 400 U.S. 309, 91 S.Ct. 381, 27 L. Ed.2d 408 (1971).

The government's application is granted. Respondent will comply with the summons.

It is so ordered.

---

7. For the full impact of the cited case, showing the great scope of the documents demanded and the refusal of the district court, ultimately vindicated, to review the multitudes of papers to see whether any were immaterial or irrelevant, see Foster v. United States, *supra*, 265 F.2d at 188; Gellhorn and Byse, Administrative Law—Cases and Comments 581–84 (4th ed. 1960).